All for your patience. We'll continue now with the second case this morning. This is Appeal 25-1726. Donnie Wittman et al. v. Olin Winchester, LLC. Ms. Sinn will begin with argument from you. Thank you, Your Honor. And may it please the Court. My name is Montana Sinn. I represent the plaintiffs' appellants here, Donnie Wittman, Corliss Mitchell, Deidre Cooley, Mildren Clark, Robert Hartman, Jr., and Juanita Mando. I'd really briefly like to just save five minutes for rebuttal at the end. I'll start with our Illinois minimum wage law claim. Here, we are, our plaintiffs are non-exempt employees under the Illinois minimum wage law because they do not meet the salary basis test or the duties test promulgated by the Secretary of Labor under the FLSA. Ms. Sinn, if the actual pay reduction never occurred here, what policy created this significant likelihood that a pay reduction could occur based upon the amount and quality of work? Plaintiffs from the jump were always told that they were, their pay was subject to reduction if they didn't work their full hours, full 45 hours per week. And that's based on, you know, they were told time after time that if they exhausted their paid time off, their time would, or their pay would start to be reduced. Is that not covered by the carve-out here of the regulation? No, Your Honor. That's actually in ours, the Supreme Court case, excuse me. You've got it right, our, yeah. Yeah, so our, they kind of, that test, that was a Supreme Court test, you know, and it implements that, you know, this was before the regulations were revised in 2004. So this is applicable here because under the IMLW, you have to apply those, those regulations that were in effect in March 30, 2003. And that Supreme Court decision actually states that not, that an employee will not be paid on a salary basis if one, there was an actual deduction, or two, an employment policy creates a significant likelihood that their pay could be reduced, right? And the hours test requires only a clear and particularized policy, one which effectively communicates that deductions will be made in specified circumstances. This wasn't a written policy, but they were told time after time after time that their pay was subject to reduction if they didn't pay, or if they didn't work 45 hours in a week, or if they did not, and they didn't have a pay time off to cover that, to cover the absence, essentially. Does it matter that here, there was no written policy here? Kennedy, the Kennedy opinion, which is a very thorough, lengthy opinion from our court, in that case, I think there was at least a written email. Here, there isn't a written policy. Does that make a difference? No, I don't think that there, whether it was a written policy or a oral policy, I think still that it effectively communicated. I mean, there was no, I mean, if you look at the underlining employment agreement, there was no written employment agreement, right? They were just slid over a piece of paper with a salary written on it whenever they were promoted. So, but it still effectively communicates that you're going to be subject to reduction if you don't have pay time off. And the difference here with Kennedy was that Kennedy, there was a choice. You either come into work, I'm sorry, you either take your time off and your PTO gets reduced, or you just get paid, you take time off without getting a significant likelihood because there was a choice there. Here, there's no choice. It's strict. If you don't, if you take time off, you're not getting paid if you don't have PTO to cover that. And so I think that that's a significant difference between that and Kennedy. And I think that a great example that we can look at is that Baden-Winterwood versus Lifetime Fitness. There was a Sixth Circuit decision in 2009. You know, there was a pay plan similar to this one where there was, you know, they were paid a predetermined amount identified as a base salary on a semi-monthly basis. But then there was also this bonus payment plan. This bonus payment plan, though, subjected them to impermissible deductions. It stated that if performance drops below 80% of the plan, then Lifetime reserved the right to reclaim the amount of previous payments by reducing the future semi-monthly guaranteed payments. And determining that these, whether these were improper or not, you know, they did look at that hours test. And while there were no actual deductions, they determined that that was a significant likelihood of reduction because of the policy specifically explicitly stated that if you fall below 80%, your next payment of guaranteed, so-called guaranteed, is going to be reduced. I'd just like to go back just a wee bit. At least one employee testified to an absence for which she did not have any sick or personal leave left, but for which the records reflect that she still received payment of the full salary. Isn't that correct? Your Honor, I think that that was an exception. They applied FMLA there. And, yeah, and I'm sorry, I don't know exactly which plaintiff you're referring to. It's at 1052, and I don't have it in front of me right now. But, OK. And then, I mean, you can see this in the Seventh Circuit, 1993, again, another example here, and Klein v. Rush Presbyterian. This was a pre-hours test, but it was essentially the same thing. There was subject to unpaid suspension for tardiness, rude behavior, or personal appearance. Again, they said that, or I guess the defendant argued that there were no actual deductions, but, again, this is an impermissible deduction because it could have happened, and it was very likelihood to happen, if they were suspended for these reasons. Ms. Sinn, can I ask you if I understand this correctly? Yes. That, as I understand it, under current federal law, under the FLSA, plaintiffs in your situation would be required to show actual deductions that were improper, and, in fact, that they were not just a few inadvertent ones, but that it was systematic. Is that right? Yes, Your Honor. Under the new rules, that's under 603. OK. And the reason you're here under the state statute is because of the old 2003... Yes, which require us to apply... OK. Yes, I'm sorry to interrupt. But, yes, it requires us to apply those as they existed on March 30, 2003. Obviously, 603, which is that requirement that there's actual deductions being made, wasn't in play yet. Thank you. Right? And this purported salary, I mean, it's nothing but an illusion. You know, it gives that impression of a salary, but after, you know, you can see that it reveals that, you know, this employment policy plaintiffs were, you know, subject to the reductions. And then moving on... I don't know how illusory it is if they were never subject to actual docking, but I understand that the law may draw that distinction. Yes, Your Honor. And then, moving on to the duties test, very briefly, you know, the district court and defendant, they like to focus on, you know, these policies or, I guess, titles and job descriptions, right? Courts have routinely held that the titles and job descriptions are not controlling. You have to look at...  Didn't the plaintiffs acknowledge that those job descriptions accurately reflected their day-to-day activities? Yes, but there's a distinction there because of the control over the people and the processes. So you can still, you know, be engaged in some of these management decisions, or, I'm sorry, these management duties, but whenever you don't have the control in the processes, a lot of the courts have found that this is a fact that's best suited for the suit... Or, I'm sorry, the issue is best suited for the fact finder because, you know, just because, you know, you're engaged in these primary duties... I'm sorry, engaged in these management duties doesn't mean that it's your primary duty if you don't have the control or exercise of discretion under that four-factor analysis. You know, I do want to ask you this. In arguing that the plaintiffs were not themselves management because nearly all of their tasks required them to report to their supervisors, are you contending that middle managers in an organization cannot be considered management under the regulation? No, Your Honour. I think it's a case-by-case determination. I mean, in every case that we see, I mean, you can't just slap on a talismanic phrase, right? That's... I think that A.L. versus T.B.A., the Sixth Circuit, actually rejected that from Donovan versus Burger King. You know, yeah, we can't just say, yeah, because you're middle management that you're not at management duties. But on the other way, you can't also say that you are management because you supervise others. Would you like to reserve the remainder of your time? Yes, Your Honour, thank you. Thank you, Ms. Sinn. Mr. Nelson will now move to you for oral argument on behalf of the appellee. Thank you. Good morning, Your Honours, and may it please the court. My name is James Nelson, and I represent Defendant Appellee Olin Winchester. This court should affirm summary judgment for defendants on both plaintiff's claims. First, plaintiff's claim for overtime under the Illinois Minimum Wage Law fails because they each fall under the executive exemption. The district court was right to hold that they were paid a salary basis and their primary duties were management. Mr. Nelson, let's talk a little about two points. Two plaintiffs, Whitman and Clark, they gave depots their citations in the record about how they were questioned on this particular circumstance. Even if your client is correct with regard to the remainder of the plaintiffs, were those two particular plaintiffs instances where they were told that they would be in a situation that they would not receive that pay in the circumstances of if it went beyond the paid time off to cover the full 40 hours? So our position is no, but for those specifically, Whitman and Clark, there was no clear and particularized policy that there, for all of the plaintiffs, but even for them under their testimony, there was no clear and particularized policy that their pay would be deducted. For Clark, I'll start with Clark. At page A2514, appendix 2514, she actually says that she didn't have leave left and she took 15-minute absences every week for school and her pay was not docked. So even with respect to Clark specifically, she testified that she did not have her pay docked for partial absences. And for all of the plaintiffs, they have a string cite in their reply brief that they say are the best cites for them being told that their pay would be docked. And those cites actually say one of two things when you go and read them. The first thing they say is if you have a partial day absence, you have to take leave time. You have to use personal leave if you have any left. That is perfectly fine under the regulation according to this court in Kennedy. There's no violation. And then the other set of cites, there are a couple where, and I believe maybe it's Whitman and Clark, that say, and I was told if I had no leave left that my pay could be docked. But that, in the context, it does not say for partial day absences. And I think Your Honor was getting to this. Under the regulation, 118A, 2 and 3, the applicable regulation, it says full day absences for personal leave. If your pay is docked for those, that does not remove the salary basis test. That does not affect the salary basis test. So if they were gone for a full day after their leave was gone, their pay could be docked. And that wouldn't violate the regulation at all. None of them ever testified that they were told if they were gone for a partial day after their leave was gone that that would result in docked pay. The undisputed evidence from General Supervisor Epps and others is that if that happens, their pay would not be docked but it would be a performance issue. And they don't have any evidence, even from their own testimony, saying that anybody told them that partial absences would result in docked pay. But the other thing I would point to is even if there was a stray comment or two made to one or more of the plaintiffs, that would not be enough for a clear and particularized policy under this court's case law. Every case that Ms. Sin mentioned when she was up here about a clear and particularized policy dealt with a written-down policy saying that if you're tardy or if you're rude that you will be suspended without pay. And that particularized, clear, written-down policy is what led the court inclined, for instance, this court inclined, before the hour test came out. But it led this court inclined to say her pay could be docked. The plaintiff in that case actually was told this policy applies to you and you may get suspended if you keep being tardy. But there was a clear written-down policy. In the Supreme Court's case in Auer v. Robbins, there actually was a written-down policy that applied to all employees. But the Supreme Court said that's not enough to be clear and particularized because there were both exempt and non-exempt employees. And it didn't clearly say that exempt employees would lose pay for impermissible reasons. So the Supreme Court actually held that was not a clear and particularized policy. Judge Roldner had a question. Thank you. There appears to be significant evidence in this case that as to areas of importance such as safety, discipline, et cetera, the plaintiffs had only the authority to pass the issue up to their supervisors and had neither the discretion nor the authority to resolve those matters themselves. Does that evidence present an issue of fact as to whether their primary duties were management such that summary judgment was inappropriate? So our position is no, Your Honor. That does not create a material issue of fact on management in this case. In particular, I think their arguments along these lines have to do with the discipline issue for management, which is that before issuing final discipline, they had to pass issues up to their supervisors. Discipline is just one of the many enumerated forms of management in the regulations under 541.102. And no case holds that in order for your primary duties to be management that you have to have authority over discipline or be able to handle disciplinary issues on your own. In fact, they actually cite case law under the new regulation, which they've conceded does not apply, the new FLSA regulations, which require particular weights to be given to your disciplinary decisions. That requirement is not in the 2001 regulations. And so because they actually did do training, they actually did supervise their employees by deciding when certain units would run. They actually did do the schedules. They called people in for overtime. They made people stay later when they needed more workers. Their entire job was to monitor and supervise these production line employees. And this court in Milliken just a few years ago said that you don't need all of the enumerated management factors. You just need your primary duty to be some of those factors. And I don't think they can really dispute that their main job was to monitor and to ensure that the production went on smoothly. And Whitman actually says specifically that his job was to make sure production went smoothly. And in the district court's case in Elliott and the Northern District of Indiana's case in Brown, they specifically looked at a production line supervisor, a middle-level supervisor, as Your Honor mentioned, just like in this case, and held that this was clearly their primary duty was management. And in this case, they've never even argued that they engaged in any production at all. In fact, Plaintiff Manda said they weren't allowed to engage on the production line. Some of the cases they cite are where somebody is actually doing 95% of their time the people that they're supposedly supervising. They're doing exactly the same thing. Like in Jackson, it was a car wash attendant. 95% of the time, he was just washing cars, and he did a little bit of management on the side. Here, they've never even argued that they do any production. What they do is they supervise the hourly employees who are doing the production. And so we would say that their primary duty is clearly management. Casual overtime includes time spent before or after an employee's regular shift. Is there anything else that's involved in casual overtime? So there are... Under the premium pay policy, there are three examples of casual overtime that are given. That's one example. Another example is traveling for company business, or another one is spent attending certain functions for training. So those are the three examples that are given in the premium pay policy. I think just the existence of casual overtime, though, focusing on the Wage Pay and Collections Act claim, they say that they were entitled to all hours over 40 to be paid overtime under the premium pay policy. But the premium pay policy specifically says casual overtime is not included for pay under this policy. And so just the existence of casual overtime disproves that claim. But we would argue that the definition, this example of casual overtime, clearly covers what was dubbed the free hour, where they had to get to the shift early and leave the shift a little late because they were the supervisor. They had to unlock the doors. The shift could not happen unless a supervisor was there. So they had to be there early and late. And all of them testify that either at the beginning or right after they started as supervisors, they were told, you will not be paid overtime for that hour. A couple of them said it was called casual overtime when they were told that. But whether it was called casual overtime or not, they were told, you will not be paid overtime for this time. And they've never been paid overtime for this time. And so because of that, there's no mutual assent for the idea that they would be getting overtime for this so-called free hour. And I'll also point out that some of them testified that it was not actually a full hour each shift. Some of them left five minutes after all of the hourly employees left. They just had to be there first in order to accomplish all the tasks, opening everything, checking safety, and they just had to leave last after all their tasks were fulfilled. It was referred to colloquially as a free hour, but they all understood that it was included in their salary pay. It was not free. They were getting paid. They just would not get paid overtime for that. The other thing I'll point out under the premium pay policy that Your Honor mentioned is that any overtime hours on page 201 of the appendix must be scheduled and authorized by a supervisor. Here, they've never even argued that they got special permission or got authorization from one of their supervisors to get paid overtime for this hour. And again, the testimony is exactly the opposite, that they were told you will not get overtime pay for this hour before. Mr. Nelson, could we go back to the minimum wage law? Yes, Your Honor. Um... It just... I don't know that I've seen before a state law written this way, in essence, freezing in time federal law from an earlier time. Um... Do you agree that if the employer had a policy in place to dock these plaintiffs for partial day absences, that that would blow the salary exemption? If there was a clear and particularized policy... Clear and particularized. Um... that they would have their pay deducted. So for... If all their leave is expired? Is that the... Yes. That's the assumption, yes. So... I think that's a tough question under this court's case in Kennedy. Because the question in Kennedy, the policy that was written down in an email, the snow day policy, was that if you couldn't come in, then either you had to take a vacation day or you could take an unpaid day off. That was the option that was given. And the court actually said that that didn't... that wasn't enough to create a clear and particularized policy. The reason it gave is because it didn't spell out the feared outcome that you actually would lose pay. And the reason was because you might have leave left when this happens.  But that dealt with full-day absences, right? Yes, Your Honor. And so... But I had thought the law was pretty clear that if you get docked for less than a day, then under that prior federal regulation, the set of regulations, then that defeats the salary exemption. And we would concede that, Your Honor. If they were docked for partial days, that would defeat the exemption.  And just so that I understand your position is, when we go back into the detailed testimony, we are not going to see threats of such partial-day docking. Is that right? Yes, you're right, Your Honor. You're not going to see any clear threat at all about a partial-day reduction. But the other point I would make, Your Honor, though, is that if there was one comment from one general supervisor to one supervisor, that would not be enough for a clear and particularized policy. The regulations actually say that if you do dock pay impermissibly, but then you fix it in enough time that you don't lose the salary basis, they're arguing that even though they've had no pay docked, if one person made a comment to them that their pay might be docked, that would be enough to lose salary basis. But that doesn't make any sense under the logic of the clear and particularized policy test, but also the safe harbor provision in the regulation itself, that you could actually inadvertently and infrequently dock pay as long as you repay it later when you realize the error, you don't lose your salary basis. Right, but if... I guess I'm... I'm troubled by the prospect of repeated oral threats that would be inconsistent with statute. Your Honor, I... Tell me I'm not gonna find that. You're not gonna find that. And I think, you know, there's a totality of the circumstances test, right? So if every Monday, every plaintiff was told, remember if your leave is exhausted, you know, you're going to lose for partial day absences, you know, maybe if it was repeated and clear and communicated to everybody, maybe you could get to a clear and particularized policy without something written down. Again, no case has ever held that one existed without something written down. But here what they're doing is they're stringing together, again, comments that you have to use leave, you have to use your available leave for both full and partial day absences, which they don't dispute is perfectly legal. And then other comments that said, remember if your leave goes out, you're gonna have to take unpaid time. You don't disagree though that we apply the Anderson Celtic Summary Judgment Standard to the record. Yes, Your Honor. It's not... That's the lens through which we're supposed to view the factual record. Exactly. And this was their time to put forward their best evidence that there was such a clear and particularized policy. At summary judgment time, they have to point to evidence in the record that would show this. And so speculation based on a couple of comments that are from their own testimony, which again are not even... None of the comments clearly say you will lose pay for a partial absence. And both Clark and Manda, I believe,  Judge Rovner was mentioning page 1052. Manda also said she was gone for a partial day and her pay was not docked. So there clearly was no policy here.  I see my time has expired. Thank you, Mr. Nelson. Thank you. Ms. Sin, we'll move back to you now for rebuttal argument. Thank you, Your Honor. I would just like to go ahead and start off with this last argument that they're making whether or not it was full day or partial day. You know, whether their pay would be reduced... I'm sorry. I guess the issue was whether, yeah, it was the threat of partial or full day absences and whether it would be reduced. I think that that itself would be a question for the jury, the fact finder, right? Because if they're saying that the summary judgment record isn't there, we're arguing the opposite. I mean, I think that's right for the fact finder to determine. Nevertheless, I mean, they're saying that, you know, only once  one supervisor ever kind of maybe had said something like this.  Donnie Whitman testified at page 447 of the appendix that Wiggenhorn told Whitman that he was not guaranteed a salary if he didn't have available PTO to cover full 40 hours. Pay would be reduced. Yeah, that was the question posed to Whitman and Whitman said that's correct. That's why I came into work even when I was sick until the COVID thing. Yes, Your Honor. And then Clark told Pullman testified that Pullman, Wiggenhorn and Hirshberg three supervisor general foreman that if she took time off and exhausted her vacation and personal time then she doesn't get paid. Her pay starts subtracting. And she does say, yeah, it's her words are it starts subtracting. Yes, Your Honor. And is that is that testimony clear and specific with respect to partial day docking?  I don't know that off the top of my hand. Isn't that critical? It would be critical.  Your Honor. Thank you. Amanda was told the same thing. She said that if I'm not here they don't pay me. Right. And then even whenever we asked Pullman in his deposition whether or not he said these things to Clark, you know, he doesn't deny it. Right. He simply just says, I don't remember. Cooley testified that Pullman stated during a  This is a meeting where all the supervisor. Yeah. The supervisor Sporeman in our plaintiff's position were in a meeting and they said that they'll start docking pay if they exhaust PTO. So they had to make sure that they were not exhausting their pay. And Your Honor. I'd like to just go ahead and touch base on some of these that they the defense sites for Brown v. Alleris. You know, those plaintiffs they still they were found to have their primary duties were management. But we have to recognize that they still had a role in these personal decisions. Right. So they were still advising upper management of staffing needs. That didn't happen here. Any recommendations that were made went by the wayside. The company company specifically relied on these recommendations to retain or not. There's no they admitted produced 10 different you know evaluations from two of our plaintiffs over the course of  And they've not testified that they've relied and kept any of or relied on any of the markings of retain or not. And with Milliken in town or Milliken v. Town of Ingalls you know there you know he admitted that he was responsible for the town's efficient operation. He was supervising,    recommendations. Here we're doing miniscule clerical work properly laid out in our brief to prove that these although they did maybe do some management activities these were not their primary duty. Thank you your honor. Thank you Ms. Sinn. Thank you Mr. Nelson. The case will be taken under advisement. The court's going to take a 10 minute break and then we'll return.